## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | **CHAPTER 13** |
| **JUNE M. SHADE,** | * | |
| Debtor | * | |
| | * | **Case No. 1-04-bk-07046MDF** |
| **TAMMAC CORPORATION,** | * | |
| Objectant | * | |
| | * | |
| v. | * | |
| | * | |
| **JUNE M. SHADE,** | * | |
| Respondent | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| | * | |
| IN RE: | * | **CHAPTER 13** |
| **STEVEN E. HOLVA and** | * | |
| **VALERIE L. HOLVA,** | * | |
| Debtors | * | |
| | * | **Case No. 1-05-bk-01304MDF** |
| **TAMMAC CORPORATION,** | * | |
| Objectant | * | |
| | * | |
| v. | * | |
| | * | |
| **STEVEN E. HOLVA and** | * | |
| **VALERIE L. HOLVA,** | * | |
| Respondents | * | |
| | * | |

## OPINION

June Shade ("Shade") filed a case under chapter 13 on November 24, 2004. Steven and

Valerie Holva ("the Holvas") filed a case under chapter 13 on March 8, 2005. In both cases, the

debtors filed chapter 13 plans in which they sought, under 11 U.S.C. §506(a), to modify the

secured claims of Tammac Corporation ("Tammac") in the mobile homes in which they

respectively reside. Before me are Tammac's objections to those plans.

1

Tammac argues that 11 U.S.C. §1322(b)(2) prohibits the modification of its claims because, in each case, the mobile homes constitute "real property that is the debtor's principal residence." Shade and the Holvas respond that the mobile homes are personal, not real property. Tammac also argues that the value of the mobile home in each case exceeds the amount of the debt. Therefore, Section 506(a) cannot be employed to cramdown the liens in any event. Determining the value of the mobile homes and whether or not they may be treated as real property are the issues to be decided in both cases.

## Procedural and Factual History

### June Shade case

Shade's home is a 1999 Redman "doublewide" manufactured home located in a mobile home park at 501 Windy Hill Road, Lot 99, Shermansdale, Pennsylvania. On March 18, 2002 Tammac loaned Shade and her daughter $48,240.50 at an interest rate of 15% to purchase the home for $49,500.00. Shade made a down payment of approximately $2,500.00. Some of the proceeds of the loan were used to purchase homeowners' insurance for a three-year period. In exchange for the loan, Shade gave Tammac a Note and Security Agreement granting a security interest in the mobile home.

Since she does not own the real estate on which the mobile home is located, Shade pays $200 a month in lot rent to the owner of the mobile home park. The home, which is twenty-eight feet wide by fifty-six feet long, was placed at its current location at some undisclosed time before Shade purchased it. The wheels, axles, and hitch on which the vehicle was transported to

2

this site have been removed.[1]  The mobile home has electric, telephone, gas, and water and sewer service and is attached to short, cinder-block  pillars with storm tie downs.  The space between the bottom of the home and the ground beneath is enclosed by skirting manufactured for this purpose.  Two wooden porches affixed to the ground provide entry into the main structure.[2]  The record does not provide an estimate of the amount of time and effort that would be necessary for the mobile home to be moved from its current location.  However, the potential expenses for relocating the unit would make it more cost effective for Tammac to try to resell the home from its current location rather than to move it. Under state law, Shade must pay property taxes of approximately $500.00 per year on the unit.

The regular monthly mortgage payment to Tammac is $635.23, but Shade has not made a payment since September 2004.   In her chapter 13 plan, Shade proposed to cramdown the value of Tammac's secured claim to $45,100.00, the assessed value for tax purposes, which she asserted to be the market value of the property.[3]  In her plan Shade proposed to reduce Tammac's interest rate from 15% to 7%, with monthly payments in the amount of $500.00 for fifty-nine months and a balloon payment of $25,000.00 due on the sixtieth month.  On January 3, 2005,

------------------------

[1]There is no evidence regarding whether these items were original equipment on this mobile home or whether they were simply "loaned" or rented solely to transport it to this site.

[2]A "stipulation" of facts submitted by Tammac does not mention a porch but does mention a wooden "deck."  The "stipulation" was not signed by Shade's counsel and so it's evidentiary utility is essentially nil.

[3]Cramdown is a term of art used to refer to the bifurcation of a claim into secured and unsecured portions pursuant to 11 U.S.C. § 506(a).  Section 1325(a)(5) permits a chapter 13 debtor to provide different treatment in the plan for the unsecured portion of the claim.  The secured creditor's claim is limited to the market value of the collateral to which the lien attaches. When the value of a claim is crammed down to zero, this process also is referred to as stripping off a claim.  *In re Bartee*, 212 F.3d 277, 280 (5th Cir. 2000) (citations omitted.)

3

Tammac filed a proof of claim in the amount of $47,122.30. Later, Tammac filed an objection to the plan, arguing that it could not be confirmed because its provisions violated 11 U.S.C. §1322(b)(2), which prohibits modification of a security interest in real property that is a debtor's principal residence. Tammac also objected to the plan on the grounds that its claim could not be modified because the fair market value of the mobile home exceeded the amount of its claim.

A hearing was held on Tammac's objection on April 5, 2005. Briefs have been filed and the matter is ready for decision.

## Stephen and Valerie Holva case

The Holvas' home is a 2003 "Timberland TL515-A" model manufactured by Colony. The Holvas purchased it from Schaff's Home Center, Inc. ("Schaff's"), Thomasville, Pennsylvania, on July 31, 2004. Prior to its purchase, the Holvas' unit had been used by Schaff's as a model home. Financing for the purchase price of $57,750.00 was provided by Tammac, who took back a security interest in the unit. The Holvas made a down payment of $6,250.00 and financed $52,005.00. The amount financed included both the remainder of the purchase price as well as homeowners' insurance premiums.

The Holvas' home is located in the Castle Hills Mobile Home Park, Lot #27, 2581 Old Harrisburg Road, Gettysburg, Pennsylvania. Like Shade, the Holvas do not own the land beneath their mobile home; they lease the lot from the mobile home park. According to the sales contract, Schaff's agreed to deliver and set the home at its current location; to hook up water and sewer lines; to remove the tires, wheels, and axles and return them to Schaff's; and to install central air conditioning, skirting, and tie downs. A pair of small decks provide entry to the residence, which has 1,456 square feet of living space. Neither party provided an estimate of the

4

amount of time and effort that would be necessary for the home to be moved from its current location, but a witness for Tammac stated that potential moving expenses would make it more cost effective for Tammac to try to resell the unit from its current location.

The Holvas' monthly payment to Tammac is $519.14, of which approximately $31.00 is applied to principal. As of the date of the hearing on this matter, the balance on the loan was $51,849.02 plus late charges, penalties and other fees totaling $1,127.22.

In their plan, the Holvas seek to cramdown the value of Tammac's lien to the market value of the property, which is set at $45,000.00 in the plan. Tammac objects to the Holvas' plan for the same reasons that it objected to Shade's plan – Tammac asserts that the Holvas' mobile home is "real property that is the debtors' principal residence" under Section 1322(b)(2). Tammac also asserts that the market value of the property is greater than the amount of its secured claim, thus precluding a cramdown regardless of whether or not the lien is protected by the anti-modification language of Section 1322(b)(2).

A hearing in the Holvas' case was held on May 17, 2005. Briefs have been filed and this matter is ready for decision.

**Discussion**

*I. When is a mobile home "real property"?*

The question of whether property falls within the definition of "real property" as contemplated by Section 1322(b)(2) is one of state law. *Nobelman v. American Sav. Bank,* 508 U.S. 324, 329, 113 S.Ct. 2106, 2110 (1993) (citing *Butner v. United States,* 440 U.S. 48, 54-55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979)). *See also Barnhill v. Johnson,* 503 U.S. 393, 398, 112 S.Ct. 1386, 1389, 118 L.Ed.2d 39 (1992).

5

In *In re Nowlin,* 321 B.R. 678 (Bankr. E.D. Pa. 2005), Judge Thomas Twardowski examined Pennsylvania law in a case with facts remarkably similar to those in the instant cases. In *Nowlin*, a debtor sought to cramdown a security interest (also, coincidentally, held by Tammac) in a mobile home. The debtor had resided in the home for a significant period but did not own the land on which the mobile home was located. Like the within debtors, Nowlin leased a lot in a mobile home park and financed homeowners' insurance with proceeds from her loan. Nowlin's mobile home also rested on cinder blocks with the wheels removed from the home and skirting attached. The home had a water heater, a furnace, and two attached porches. Gas, electric, cable television and telephone service were likewise provided. The only marginally significant difference between the instant cases and Nowlin's was that Nowlin's "long term intention" was to eventually move the home when she was able to purchase land. In the instant cases, Shade testified that she had no intention of moving the home, and there was no testimony from the Holvas regarding their intentions.[4] In light of its findings, the *Nowlin* Court concluded as a matter of law that the mobile home in question was personal property for purposes of section 1322(b)(2).

Thoroughly researched and well reasoned, *Nowlin* is worth quoting at length.

[U]nder Pennsylvania law, chattels used in connection with real estate fall into one of three classes:

First, those which are manifestly furniture, as distinguished from improvements, and not peculiarly fitted to the property with which they are used; these always remain personalty. (citations omitted). Second, those which are so annexed to the property that they cannot be removed without material injury to the real estate or to themselves; these are realty, even in the face of an expressed intention that they should be considered personalty . . . (citations omitted). Third, those which, although physically connected with the real estate, are so affixed as to be removable without destroying or materially

_____

[4]The Holvas did not testify at all.

6

injuring the chattels themselves, or the property to which they are annexed; these become part of the realty or remain personalty, depending upon the intention of the parties at the time of the annexation; in this class fall such chattels as boilers and machinery affixed for the use of an owner or tenant but readily removable. (citations omitted).

*Id.* 321 B.R. at 681 (citing *Clayton v. Lienhard,* 312 Pa. 433, 436-37, 167 A. 321, 322 (1933);

*Blocker v. City of Philadelphia,* 563 Pa. 559, 563, 763 A.2d 373, 375 (2000)).  Without further

discussion, *Nowlin* concluded that mobile homes fall within the third category of chattels.

Accordingly, the court determined that the issue of whether a particular mobile home is real

estate must be decided according to the intention of the parties, "examining all of the facts and

circumstances of the case. . . ."  *Id.* (citing *Appeal of Lantz,* 199 Pa.Super. 310, 184 A.2d 127,

129 (1962)).  *See also Streyle v. Board of Property Assessment, Appeals and Review,* 173

Pa.Super. 324, 98 A.2d 410 (1953).

> Among the facts and circumstances we shall consider are the following: *(1)* whether the mobile home and the lot on which it sits are owned by the same party; *(2)* whether the mobile home is permanently attached to the land; *(3)* the method by which the mobile home is attached to the land; *(4)* the length of time that the mobile home has been attached to the land; *(5)* the relative ease of moving the mobile home from the land; *(6)* whether the mobile home can be removed from the land without damaging the land; *(7)* whether the mobile home is necessary or essential to the real property; and *(8)* the conduct of the owner and whether it evidences an intent to permanently attach the mobile home to the real property.

*Nowlin,* 321 B.R. at 681 (citing *Noll v. Harrisburg Area YMCA,* 537 Pa. 274, 643 A.2d 81, 88

(1994); *Lehmann v. Keller,* 454 Pa.Super. 42, 684 A.2d 618, 622 (1996); *Appeal of Sheetz, Inc.,*

657 A.2d 1011, 1014 (Pa. Commonwealth Ct.) *appeal denied* 542 Pa. 653, 666 A.2d 1060

(1995); *Lantz,* 184 A.2d at 129; *Tammac Corporation v. Hill* (*In re Hill*), Case No. 1-03-01604

(Bankr. M.D. Pa. November 20, 2003)*; Fromm v. Frankhouser,* 7 Pa. D & C.3d 560, 1977 WL

269 (Lancaster County 1977); *Central Counties Bank v. Moyer,* 4 Pa. D. & C.3d 304, 1977 WL

383 (Centre County 1977); *Hartman v. Fulton County,* 24 Pa. D. & C.2d 611, 1961 WL 6424

7

(Fulton County 1961); *In re Coyle Assessment,* 17 Pa. D. & C.2d 149, 1959 WL 7499

(Northampton County 1958)).

      *A. Application of the Nowlin factors to the instant cases*

      Applying the *Nowlin* factors to the instant cases demonstrates that both the Holvas' and

Shade's mobile homes are personal property and not real estate.

      *1. Whether the mobile home and the lot are owned by the same party.*

      The significance of the first *Nowlin* factor to this outcome can hardly be overemphasized.

Without the real property beneath them, the *mobile* homes are movable chattel and, therefore,

inherently personalty. *Lancaster Laboratories, Inc. v. Commonwealth of Pennsylvania*., 134

Pa.Cmwlth. 59, 67, 578 A.2d 988, 992 (1990) *vac'd in part on other grounds*, 148 Pa.

Commonwealth Ct. 465, 611 A.2d 815 ("'Personal property' is defined generally as . . . or any

right or interest which one has in things movable." (citing *Black's Law Dictionary* 1096 (5th ed.

1979)). A mobile home may become "real property" only when it is intended to be permanently

attached to the real estate beneath it. In the within cases, the real properties on which both

mobile homes are located are owned by third parties, not the debtors. In Shade's case, while she

testified that she intends for the home to be permanently attached, that decision is obviously not

hers to make alone. Tammac did not introduce testimony from the owner of the mobile home

park, and so the Court does not know that party's intentions, but the Court certainly cannot

presume that the lot owner wants this mobile home there permanently. Without knowing the

intention of the park owner, the Court cannot find that Shade's home is intended to be

permanently attached. The same result obtains in the Holva case, albeit based on the obverse

evidentiary situation. The Holvas' expert testified that their mobile home would be "allowed to

remain in the park" (N.T. 57), but since Tammac did not call either of the Holvas to testify, the record contains no evidence as to whether they intend to keep the mobile home at its current location or not.[5]

Tammac points out that Shade pays municipal "real estate" taxes on the mobile home itself.[6] The payment of such taxes is not dispositive of the issue before me, but only a factor to be considered (although this factor was not considered in *Nowlin*). The tax laws do not control the issue of what may be considered to be "real property" in Pennsylvania. *See generally* Henry S. Perkin, Comment, *Local taxation of mobilehomes* (sic) *and trailer camps in Pennsylvania – meeting the burden*, 10 Duq.L.Rev. 236, 242 - 245 (1971). As Tammac itself points out, other Pennsylvania laws, such as those requiring pre-foreclosure notices of default to be sent to borrowers, do not treat mobile homes as real estate. The applicable tax law, 72 Pa.C.S. §5020-201provides as follows:

> The following subjects and property shall, as hereinafter provided, be valued and assessed, and subject to taxation for all county, city, borough, town, township, school and poor purposes at the annual rate:
>
> (a) All real estate, to wit: Houses, house trailers and mobile homes buildings permanently attached to land *or connected with water, gas, electric or sewage facilities*, buildings, lands, lots of ground and ground rents, trailer parks and parking lots, mills and

---

[5]I would be reluctant to make a factual finding, in any event, regarding the intent of the mobile home park owner based on the testimony of the Holvas' expert, who did not testify that he was the owner or an agent of the owner.

[6]There was no testimony regarding whether the Holvas pay real estate taxes on their mobile home or not.

9

manufactories (sic) of all kinds, furnaces, forges, bloomeries, distilleries, sugar houses, malt houses, breweries, tan yards, fisheries, and ferries, wharves, all office type construction of whatever kind . . . .

72 P.S. § 5020-201(italics added).

This statutory definition is more expansive than the common law definition of real property because it includes not only mobile homes that are "permanently" attached to land, but also those that are merely connected to utilities. The statutory definition is not intended to supplant the common law definitions, but to broaden the tax base and to "level the playing field." *See Hartman*, 24 Pa. D&C 2d at 613 ("Whether house trailers used as living quarters are subject to taxation as real estate has been a vexing question for assessment authorities. It seems unjust that one family should live in an elaborate house trailer without being taxed on the value of the trailer while their neighbors, living in a modest house of much less value, should have the value of the house included in the value of their real estate for tax purposes"). Moreover, even in interpreting this statute, some of the lower courts of Pennsylvania have held that a mobile home situated on real estate owned by another is not real property and cannot be taxed as real estate. *Hartman,* 24 Pa. D&C 2d at 615 ("a trailer cannot be assessed as real estate unless it has, in fact become such"); *Moyer,* 4 Pa. D. & C.3d at 306 ("It would indeed create an impossible situation if a person bought basically a motor vehicle, a motor home, under a Pennsylvania motor vehicle installment sale contract and then were allowed to place it on a piece of land which he did not own and, thereby convert the same to real estate to the prejudice of a chattel security interest. [I]f one intentionally fixes his own chattel to the land of another it is, in legal effect, a gift of it to the owner of the land. We cannot imagine that the owner of the mobile home had such intention").

10

Thus, the fact that Shade pays real estate taxes on her mobile home is not persuasive on the issue of whether it is real property for purposes of Section 1322(b)(2).

*2 & 3. The means, if any, by which the mobile homes are attached to the land.*

While both mobile homes are "attached" to the land, the manner in which they are attached is by no means irreversible. Shade's home is attached to cinder blocks with storm tie downs. The record does not contain a description of "storm tie downs," but the name itself implies that the purpose of the apparatus is to protect an otherwise temporary, insecure arrangement against damage from wind, flooding or other potential hazards, not to create a permanent structure. The evidence in the Holva case is that the home is not truly "attached" at all, but merely rests on concrete piers.[7]

*4. The length of time the homes have been attached to the land.*

Regarding factor (4), the evidence in Shade's case is not persuasive one way or the other. Her mobile home is a 1999 model that she purchased in March 2002. I do not find the few years between then and the filing of her petition to be so long as to equate with permanence, nor so short as to be considered transience. The Holvas' mobile home had been at its location for less than a year prior to their petition. This fact is more indicative of a lack of permanence. *See Moyer, supra.*

---

[7]While the contract between Schaff's and the Holvas states that the purchase price of the home includes the installation of "tie downs" by Schaff's, the unrebutted testimony of the Holvas' expert was that he performed a visual inspection of the undercarriage of the mobile home and that it was not tied down.

11

*5 & 6. The relative ease of moving the mobile home without damaging the land.*

As indicated above, the evidence on factors (5) and (6) does not persuade me that either mobile home has constructively become part of the real estate. There is no evidence whatsoever that the real estate would suffer damage by the removal of either mobile home. While Tammac presented evidence regarding the economic impediments to moving these homes, it did not provide testimony that such efforts would damage the land.

*7. Whether the homes are "essential" to the property.*

Neither mobile home is "essential" to its respective property. Both are situated in mobile home parks where arrivals and departures of mobile homes are obviously anticipated. Both rest on cinder blocks or concrete platforms, with no permanent foundation. One apparent reason for the lack of a permanent foundation is the prospect that a unit eventually will be replaced by another home.

*8. Intent of the parties.*

The only evidence in either case that favors a judgment for Tammac is Shade's testimony that she has no intention of moving the home at any time in the future.[8] While, again, the intent of the debtor is a factor to be considered, no amount of unilateral intent, however firmly held, can overcome the fact that the mobile home itself is a chattel, not real estate; that Shade does not own the real estate to which the mobile home is now attached; and that the intent of the land owner is unknown.

---

[8]Again, the Court has no evidence regarding the intent of the Holvas. See footnote 4, supra.

12

Based on all of the above-discussed factors, the Court concludes as a matter of law that both mobile homes are personalty, not real estate.

*II. Valuation of the mobile homes.*

Tammac has filed a timely proof of a secured claim in both cases before the Court. Through their chapter 13 plans, both Shade and the Holvas sought to reduce the secured amount of Tammac's claims. As I discussed in *In re Dickey*, 293 B.R. 360, 363 (Bankr. M.D. Pa. 2003) the filing of a motion under 11 U.S.C. §506(a) is clearly the better procedure to determine the value of a claim secured by a lien. As I will discuss below, the failure to file a motion under Section 506 complicates the process of allocating the burden of proving the pivotal issue in cramming down a lien – the value of the property.

"A Debtor seeking reorganization under Chapters 11, 12 or 13 has the burden of establishing that the plan complies with the statutory requirements for confirmation." *In re Petrella*, 230 B.R. 829, 832 (Bankr. N.D. Ohio 1999) (citing *In re Maras,* 226 B.R. 696 (Bankr. N.D. Okla. 1998). "However, a party objecting to confirmation bears the burden of proof as to the objection." *Petrella,* 230 B.R. at 832 (citing *In re Mendenhall,* 54 B.R. 44 (Bankr. W.D. Ark. 1985); *In re Zellner,* 827 F.2d 1222 (8th Cir.1987)). In contrast, when a secured creditor has filed a proof of claim, as Tammac has done in the instant cases, it constitutes prima facie evidence of the validity and amount of its claim. *See In re Brown,* 82 F.3d 801, 805 (8th Cir.1996); Fed. R. Bankr.P. 3001(f). This presumption places the burden of producing evidence to contest the claim on the debtor. *Id.*

In *In re 183 Lorraine St. Assocs.,* 198 B.R. 16, 27 (E.D.N.Y.1996), the court applied the Rule 3001(f) presumption to allocate the burdens of proof and persuasion in a valuation hearing

Case 1:05-bk-01304-MDF    Doc 24    Filed 08/25/05    Entered 08/25/05 15:29:09    Desc
Main Document      Page 13 of 23

under Section 506(a). It stated that if an objection is made to the characterization of a claim as fully secured, the defending creditor has the ultimate burden of persuasion. *Id.* Likewise, the court in *In re Southmark Storage Assocs. Ltd. Partnership,* 130 B.R. 9, 10 (Bankr.D.Conn.1991), held that the objector (the debtor) has the initial burden to overcome the presumption of the validity of a proof of claim, but the ultimate burden of persuasion is on the creditor to prove by a preponderance of the evidence the value of the collateral that secures its claim. Unlike the above-cited cases, however, the matter *sub judice* is not a hearing on a motion to determine secured status under 11 U.S.C. §506(a) but is an objection to confirmation of a plan.

The Bankruptcy Code does not allocate the burden of proof on an objection to confirmation, and cases dealing with the issue of allocation arrive at different conclusions. Some courts have ruled that the proponent of a chapter 13 plan has the burden of proof to show that the requisite tests for confirmation have been met. *In re Mendenhall,* 54 B.R. 44, 45 (Bankr. W.D.Ark. 1985) (citing *In re Crago,* 4 B.R. 483 (Bankr. S.D. Ohio 1980); *In re Elkind,* 11 B.R. 473 (Bankr. D. Colo. 1981); *In re Wolff,* 22 B.R. 510 (Bankr. App. 9th Cir. 1982); *Matter of Ponteri,* 31 B.R. 859 (Bankr. D. N.J. 1983); *In re Smith,* 39 B.R. 57 (Bankr. S.D. Fla. 1984); *In re Goodavage,* 41 B.R. 742 (Bankr. E.D. Va. 1984)). Following the general rule in civil litigation, other courts have determined that the burden of proof rests on the moving party, the creditor objecting to confirmation of the debtor's chapter 13 plan. *Mendenhall,* 54 B.R. at 45 (citing *In re Tomeo,* 1 B.R. 673 (Bankr. E.D. Pa. 1979); *In re Flick,* 14 B.R. 912 (Bankr. E.D. Pa. 1981); *In re DeSimone,* 17 B.R. 862 (Bankr. E.D. Pa. 1982)). In *Mendenhall,* the Court considered the burden of proof in valuing a mobile home in response to an objection to confirmation in a chapter 13 case. Each party in *Mendenhall* submitted a written appraisal of the

14

mobile home, which the court found to be of little value in making its determination. The court concluded that the burden of proof was determinative on the issue of valuation and held that the objecting creditor had the burden of persuasion to sustain its objection. *Id.* at 47. The court stated that if Section 1325 places any burden on the debtor, it is to rebut any evidence introduced to support an objection to confirmation. *Id.* at 46. The burden of production may then shift from opponent to opponent, but the burden of persuasion remains with the objecting creditor. *Id.* at 47.[9]

The *Mendenhall* case, foursquare analogous to the instant cases, provided a thoughtful analysis of the difficulties of allocating the burden of proof.

> The term "burden of proof" refers to two distinct concepts. The concepts may be referred to as (1) the risk of nonpersuasion or the burden of persuasion; and (2) the burden of going forward with the evidence. See 9 J. Wigmore, *Wigmore on Evidence* §§ 2485-2490 at 283 (Chadbourn rev.1981). The burden of persuasion is a static burden which remains on the party in whom it is first placed. This party has the duty of initially going forward with the evidence. However, once evidence is presented that raises a doubting point, the burden of producing evidence shifts to the opponent, unlike the burden of persuasion which does not shift. After all of the evidence has been introduced, and if the parties have sustained their burden of producing evidence, the burden of persuasion becomes critical. *McCormick on Evidence* § 336 at 784 (2d ed.1981). In this case the parties have not introduced persuasive evidence on the disputed fact in this case, so the burden of persuasion becomes the crucial factor in determining whether the plan is to be confirmed.
> There are several reasons advocated for allocating the burden of persuasion to one party. The burden of persuasion is often allocated to the party asserting affirmative allegations, the party who has ready access to knowledge, or the party to whose case the fact is essential. 9 J. Wigmore, *Wigmore on Evidence* § 2486 at 288 (Chadbourn

---

[9]*But see In re Roberts*, 210 B.R. 325, 328 (Bankr. N.D. Iowa 1997) (Court concludes that the presumption of the prima facie validity of a claim in Rule 3001(f) applies to a valuation hearing arising in the context of chapter 13 plan confirmation. The debtor has the burden of coming forward with sufficient evidence to rebut that presumption. If debtor presents sufficient evidence to rebut this presumption, the burden then transfers to the creditor to assume the ultimate burden of persuasion on the issue of the value of the collateral securing its claim.)

rev.1981); F. James and G. Hazzard, *Civil Procedure* § 7.8 at 249 (2d ed.1977). One commentator suggests allocation of the burden of proof depending upon the basis of the objection to confirmation. *See In re Flick,* 14 B.R. [912] at 915 [(Bankr. E.D. Pa. 1981)]. Generally, in civil litigation, the moving party who seeks to change the present state of affairs has the ultimate burden of proving allegations. *Reliance Life Insurance Co. v. Burgess,* 112 F.2d 234 (8th Cir.1940), *cert. denied,* 311 U.S. 699, 61 S.Ct. 137, 85 L.Ed. 453, *reh'g denied,* 311 U.S. 730, 61 S.Ct. 391, 85 L.Ed. 475 (1940). Although the civil litigation guidelines for allocation of the burden of proof are helpful, for several reasons it is difficult to draw an accurate plaintiff-defendant analogy between a Chapter 13 bankruptcy confirmation proceeding and a civil proceeding.

When an objection to Chapter 13 confirmation is filed by the trustee or a creditor, several departures from general civil litigation occur. An objection takes no special form; it can be a letter to the Court or a formal pleading. No response or answer is required to be filed on behalf of the debtor. None of the parties acquire the traditional labels of plaintiff or defendant, and the style of the pleadings may carry only the debtor's name and case number. Further, an objection to confirmation is neither an adversary proceeding nor a contested matter.

As a practical matter, this Court is never confronted with the Chapter 13 confirmation hearing unless an objection to the debtor's proposed plan is filed. 11 U.S.C. § 1324 requires that the "Court shall hold a hearing on confirmation of a plan," yet 11 U.S.C. § 102(1)(A) states that notice and a hearing can be a notice and a hearing that are appropriate under the circumstances. 11 U.S.C. § 102(1)(B) authorizes the Court to confirm a Chapter 13 plan without an actual hearing if a party in interest does not timely request a hearing, and that is the practice followed in this District.[10]

Analogous to civil litigation, in an objection to confirmation, the objecting party is seeking to alter the status quo, because without the objection, the plan would be confirmed. The creditor also possesses the information with which to attack the plan as nonconfirmable. It is for these reasons that the Court places the burden of persuasion on the creditor who somewhat can be compared to the plaintiff in civil litigation.

*Mendenhall*, 54 B.R. at 46-47.

I agree with *Mendenhall* and those bankruptcy courts in Pennsylvania that hold that the

burden of proof should be placed on the party seeking to "change the status quo." However,

these courts conclude that the "status quo" is established by the proposed plan to which the

---

[10]Section 1324 provides that "[a]fter notice, the court shall hold a hearing on confirmation of the plan." While I agree with the reasoning of the *Mendenhall* court regarding the burden of proof in a confirmation hearing, I am not convinced that the language of Section 1324 is a "similar phrase" to "after notice and a hearing" under Section 102(1)(B) thus excusing the requirement to actually convene a hearing.

16

secured creditor is objecting and so the creditor should bear the ultimate burden of proof. I disagree with this conclusion. It seems more logical that the true "status quo" is the situation that existed pre-petition. Thus, it is the debtors who ought to bear the burden of proof when they seek to change the status quo established in the security agreement through the plan confirmation process. Placing the burden of proof on a debtor when the plan proposes to cramdown a lien under §506(a) places the burden of proof on the same party on which it rests when the debtor files a motion under §506(a). A party should not be permitted to shrug off her substantive burden by using the confirmation "short-cut" to achieve her ends. Accordingly, I conclude that it was the debtors' burden to prove the value of their homes in the instant cases.

      A. *Application of the burden of proof to the Shade case.*

      Shade's testimony provided the only evidence to support her burden of proof. A debtor's testimony about the value of property of the estate may be sufficient to carry the burden of proof if unrebutted by the creditor. *In re Northeastern Copy Services, Inc.,* 175 B.R. 580 (Bankr. E.D. Pa. 1994)(collecting cases). In this case, the value of the property was based upon a commonly accepted measurement, a recent tax assessment. Tammac presented no expert testimony, but attempted to rebut debtor's testimony by quoting a professional appraisal in its brief. This information, constituting neither evidence nor legitimate argument, cannot be accepted by the Court.[11] *In re Vincente*, 257 B.R. 168, 181 (Bankr. E.D. Pa. 2001) (exhibits

---

      [11]Had Tammac bothered to bring a professional appraiser to testify as an expert witness at the instant hearing, the outcome of this case might well be different. Certainly the Court's need to scrutinize the burden of proof issue would likely have been obviated, since the testimony of an unbiased expert almost always trumps that of a biased layperson/party, no matter which party bears the burden of proof. *In re Glaser*, 2002 WL 32375007, *5 (Bankr.E.D.Va.) ("Although owners have historically been allowed to offer opinion testimony as to the value of their real and personal property, the probative value of such testimony is frequently not very high"). The only

attached to briefs have no evidentiary weight); *In re MacDonald,* 222 B.R. 69 (Bankr. E.D. Pa. 1998); *In the Matter of Holly's, Inc.,* 190 B.R. 297 301 (Bankr. W.D. Mich. 1995). Therefore, I conclude that Shade has borne her burden of proving the value of the mobile home and that such value is $45,100.00.

> B. *The appropriate cramdown interest rate in the Shade case.*

A debtor is required to provide the creditor with the present value of the claim over the life of the plan. Shade's plan proposes to modify the contract interest rate from 15% to 7%. The reduction of the interest rate is permissible under Section 506(a) provided that the reduced rate is calculated to provide the creditor with the "market rate" of interest on a similar loan. In *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed. 2d 787 (2004), the Court held that a cramdown interest rate should be calculated according to the "formula approach" requiring the adjustment of the prime national interest rate based on the risk of nonpayment created by the particular economic circumstances of the individual debtor. *Till* places the burden of proving the extent of those risk factors on the creditor seeking an interest rate higher than prime. *Id.* 541 U.S. at 484 ("the formula approach, which begins with a concededly low estimate of the appropriate interest rate and requires the creditor to present evidence supporting a higher rate, places the evidentiary burden on the more knowledgeable party. . . .") *Till* further instructs that the interest rate should be calculated "as of the effective date of the plan." *Id.* 541 U.S. at 474. In its brief, Tammac argues that a "significant" upward adjustment to the prime rate is necessary, but offers no specific legal or factual support for such argument. Tammac acknowledges the

---

reason that the Court can discern for Tammac's failure to call an appraiser is that the amount of the cramdown, $2,022.30, made it economically illogical to pay an expert to perform an appraisal and to testify.

18

*dicta* from *Till* that a standard adjustment for a debtor in bankruptcy might range from 1% to 3%. Without any evidence from Tammac as to the risk factors present in the Shade case, the Court will adjust the rate of interest to prime plus 1%. Shade's plan states that its effective date would be the date of confirmation. That date has not yet arrived. Therefore, the Court will use the current prime rate, which is 6.5%. Adding 1% as the risk factor, the appropriate rate of interest to be applied to Tammac's claim through Shade's plan is 7.5%.

     *C. Application of the burden of proof in the Holva case.*

     Both sides provided expert testimony regarding the value of the Holva's mobile home. Tammac's expert, Keith Pfeiffer ("Pfeiffer"), appraised the mobile home at $61,300.00, an amount that exceeds the original purchase price by $3,350.00, which would represent a 5.7% increase in the value of the mobile home in ten (10) months time. Debtor's expert, Forrest Myers ("Myers"), valued the mobile home at $48,000.00. While both witnesses were qualified as experts, only Myers is a state-certified real estate appraiser. Because Pfeiffer is not a real estate agent, he does not have access to the regional "multi-list" of homes.[12] Therefore, his estimate of value is based on his experience in the modular home construction industry, and he used publications from that industry to formulate his valuation. Specifically, he reviewed the NADA guide to obtain the current resale price for a 2003 Timberland 515-A. He then subtracted 10% from that amount based on the condition of the Holvas' home, which he deemed to be "excellent." He then reviewed other more obscure industry publications to obtain prices for

---

[12]The "multi-list" is a publication of homes for sale from which a real estate agent can identify recently sold homes of comparable location and character to a subject home. Circulation of this publication is restricted to professionals such as licensed real estate agencies. It is not available to the general public.

19

selected components of the Holvas' Timberland 515-A.  He then added these prices to the current NADA price for the standard model.  Myers, on the other hand, provided a traditional appraisal based on comparing the recent sales prices of other similar mobile homes near the Holvas' home.

I find Myers' testimony to provide the more reliable estimate of value.  Myers testified credibly regarding comparable mobile homes that he examined to reach his conclusions.  His use of two mobile homes from the same mobile home park as comparables was appropriate, and his explanation that a third mobile home from outside the park should be included gave balance to the appraisal.  Myers testified that he used a mobile home from outside the Holvas' home park in order to ensure that this particular park did not provide some added value to the Holvas' mobile home that it would not enjoy if it were located in some other park.  While two of the comparables he chose were approximately 20% smaller in size than the Holvas' mobile home, he made appropriate adjustments to the values to account for this difference.

In contrast, Pfeiffer's opinion, based on calculations of figures gleaned from trade publications, lacked the reliability generally associated with the comparable sales approach to valuation. *See generally In re Lokay,* 269 B.R. 132 (Bankr. W.D. Pa. 2001) ("In our estimation, the comparable sales approach provides the most reliable indicator of the value of the property.") Pfeiffer's opinion was based in large part on specific figures that he obtained in a publication which he referred to as the National Appraisal System ("NAS").  Pfeiffer  provided no testimony regarding the reliability of the NAS.  Thus, the Court is without any information on which to determine its reliability.   Inasmuch as "an expert's conclusion rises no higher than the data which provide the foundation," *In re Mocco*, 222 B.R. 440 (Bankr. N.J. 1998), and the record

contains no information or data regarding the NAS as a foundation for Pfeiffer's testimony, I find Pfeiffer's opinion as to the value of the mobile home to be less reliable than Myers' testimony. Moreover, Pfeiffer's conclusion that the Holvas' vehicle would actually have *increased* in value by over 5% in the ten months between the sale of the home points up significant questions about the reliability of the NAS. That is, the NAS appraisal form provides four general descriptive categories of homes: "excellent," "good," "fair," and "poor." Pfeiffer testified that the Holvas' home was in "excellent" condition – the highest rating available. Under the NAS, a home in "excellent" condition nevertheless deserves a 10% *reduction* in value. Accordingly, Pfeiffer commenced his appraisal by taking the NADA's estimate of value for a 2003 Timberland ($49,961.00), adjusting that value for the Mid-Atlantic geographic region (an increase of 1.01%), and then reducing that figure by 10%. According to Pfeiffer, the calculation could not end there, however, because the Holvas' home contained "extras" that compelled a higher valuation. Therefore, he added value for numerous items, including a shingled roof (rather than the basic galvanized roof), skylights, and double-paned thermal windows, in order to arrive at an appraisal value of $61,300.00. By Pfeiffer's method of appraisal, it would appear that the base value of the mobile home itself (not including the land beneath it) *decreased* while the value of the extras *increased* to such an extent that the home is now worth more "used" than it was "new." Such a result simply defies logic.

Accordingly, I conclude that the value of the mobile home is that estimated by Myers – $48,000.00. Therefore, Tammac's loan is subject to modification under Section 506(a) since the amount of the secured claim exceeds the value of the collateral.

21

*D. Appropriate cramdown interest rate in the Holvas' case*

For reasons similar to those discussed in the Shade case, I conclude that the appropriate interest rate in the Holvas' case should be prime plus 1%. Again, Tammac did not present specific evidence or argument in support of its burden of proof to show that a greater adjustment is warranted. The effective date of the Holvas' plan is the date of confirmation. Accordingly, the interest rate to be applied through the Holvas' plan should be 7.5%.

## <u>Conclusions</u>

Shade may cram down the value of Tammac's secured claim, despite the prohibitions of Section 1322(b)(2), because Tammac's collateral is not real estate.[13] Shade has proven that the value of her mobile home is less than the amount of Tammac's secured claim. Therefore, Shade's plan may be confirmed insofar as it fixes the value of the mobile home at $45,100.00. However, the interest rate proposed by the plan is insufficient under *Till.* Therefore, Tammac's objection to the plan must be sustained insofar as the plan proposes to reduce the interest rate below 7.5%. Shade shall be allowed ten days from the date of the order that accompanies this Opinion in which to file an amended plan that incorporates an interest rate consistent with this Opinion.

The Holvas may also cram down Tammac's secured claim to the estimated value as provided by the evidence – $48,000.00. The Holvas' plan currently states that the value of the

---

[13]I recognize that the instant decision in which I find that mobile homes are not real property appears to depart from the conclusion I reached in a recent unpublished opinion. Specifically, in *In re Brian K. Hill and Yvonette A. Hill,* Case No. 1-03-01604, I concluded that the mobile home at issue could be considered real estate for purposes of Section 1322(b)(2). The significant difference between the instant cases and *Hill* is that in the *Hill* case the debtors owned the land on which the mobile home was located.

22

mobile home is $45,000.00. Therefore, the Holvas' plan must be amended to incorporate the value determined by the Court. The Holvas' plan must also be amended to incorporate an interest rate consistent with this Opinion. The Holvas will also have ten days in which to file an amended plan. An appropriate order will be issued consistent with this Opinion.

BY THE COURT,

Bankruptcy Judge

Date: August 25, 2005

*This electronic opinion is signed and filed on the same date.*